| | |
|---|---|
| 1 | **THE WESTON FIRM** |
| 2 | GREGORY S. WESTON (239944) |
| | *greg@westonfirm.com* |
| 3 | JACK FITZGERALD (257370) |
| | *jack@westonfirm.com* |
| 4 | MELANIE PERSINGER (275432) |
| | *mel@westonfirm.com* |
| 5 | COURTLAND CREEKMORE (182018) |
| 6 | *courtland@westonfirm.com* |
| 7 | 1405 Morena Blvd., Suite 201 |
| | San Diego, CA 92110 |
| 8 | Telephone:  (619) 798-2006 |
| 9 | Facsimile:   (480) 247-4553 |

**LAW OFFICES OF RONALD A. MARRON, APLC**
RONALD A. MARRON (175650)
*ron@consumersadvocates.com*
MAGGIE K. REALIN (263639)
*maggie@consumersadvocates.com*
SKYE RESENDES (278511)
*skye@consumersadvocates.com*
3636 4th Street, Suite 202
San Diego, CA 92103
Telephone:  (619) 696-9006
Facsimile:   (619) 564-6665

| | |
|---|---|
| 10 | <u>**Counsel for Plaintiffs**</u> |
| 11 | |

FILED
CLERK, U.S. DISTRICT COURT

JUN - 6 2012

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| | |
|---|---|
| 12 | **UNITED STATES DISTRICT COURT** |
| 13 | |
| 14 | **CENTRAL DISTRICT OF CALIFORNIA** |
| 15 | |
| 16 | Case No: |
| 17 | Class Action **CV12- 04936(BM(PLA*)** |
| 18 | ALICE VINSON and LUCINA CALDERA, on behalf of themselves and all others similarly situated, |
| 19 | |
| 20 | Plaintiffs, |
| 21 | |
| 22 | v. |
| 23 | THE J.M. SMUCKER COMPANY, |
| 24 | Defendant. |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

**COMPLAINT FOR VIOLATIONS OF:**

**OHIO CONSUMER SALES PRACTICE ACT;**

**OHIO DECEPTIVE TRADE PRACTICES ACT;**

**CALIFORNIA UNFAIR COMPETITION LAW;**

**CALIFORNIA CONSUMER LEGAL REMEDIES ACT;**

**CALIFORNIA FALSE ADVERTISING LAW; AND**

**BREACH OF IMPLIED AND EXPRESS WARRANTIES**

<u>**DEMAND FOR JURY TRIAL**</u>

CLASS ACTION COMPLAINT

Plaintiffs Alice Vinson and Lucina Caldera, on behalf of themselves, all others similarly situated, and the general public, by and through undersigned counsel, hereby sue Defendant The J.M. Smucker Company ("Smucker") and, upon information and belief and investigation of counsel, allege as follows:

## JURISDICTION AND VENUE

1.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d)(2) (The Class Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs and because more than two-thirds of the members of the Class reside in states other than the state of which Defendant is a citizen.

2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Plaintiff Lucina Caldera resides in and suffered injuries as a result of Defendant's acts in this District, many of the acts and transactions giving rise to this action occurred in this District, and Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets of this District through the promotion, marketing, distribution, and sale of its products in this District; (2) resides in this District; and (3) is subject to personal jurisdiction in this District.

## NATURE OF THIS ACTION

3.     Plaintiffs Alice Vinson and Lucina Caldera repeatedly purchased Uncrustables Sandwiches, Crisco Original Shortening, and Crisco Butter Flavor Shortening (collectively, the "Smucker PHVO Products") made by Smucker throughout the Class Period defined herein.

4.     Smucker uses various methods to falsely represent the Smucker PHVO Products as healthful and not harmful to the cardiovascular system; however all of the Smucker PHVO Products contain dangerous levels of partially hydrogenated vegetable oil ("PHVO"), a food additive banned in many parts of the world due to its high content of artificial trans fat, a highly toxic carcinogen for which there are many safe and commercially equivalent substitutes. Although Smucker has safe substitutes available,

CLASS ACTION COMPLAINT

including alternative formulations without artificial trans fat for the Smucker PHVO Products, it chooses not to use such formulations to increase profit.

5.      Artificial *trans* fat raises the risk of coronary heart disease more than any known nutritive product.

6.      Artificial *trans* fat causes heart disease by raising the level of "bad" LDL cholesterol and lowering the level of "good" HDL cholesterol.

7.      Artificial *trans* fat also causes cancer and type 2 diabetes.

8.      The proposed nationwide class action is necessary to remedy Defendant's unlawful conduct. Plaintiff brings class claims for Defendant's violations of the Ohio Consumer Sales Practices Act, Ohio's Deceptive Trade Practices Act, California's Unfair Competition Law, California's False Advertising Law, California's Consumer Legal Remedies Act, and for breach of implied and express warranties.

9.      Plaintiffs seek an order compelling Smucker to: (1) cease marketing and selling the Smucker PHVO Products using the false, misleading, deceptive, and unconscionable tactics complained of herein; (2) conduct a corrective advertising campaign; (3) destroy all misleading and deceptive materials and products;  (4) award Plaintiffs and other Class members restitution, actual damages, and punitive damages to the extent permitted under the law; and (5) pay costs, expenses, and reasonable attorneys' fees.

**PARTIES**

10.     Defendant The J.M. Smucker Company is an Ohio corporation with its principal place of business in Ohio. Smucker produces and manufactures Uncrustables Sandwiches, Crisco Original Shortening and Crisco Butter Flavor Shortening.

11.     Plaintiff Alice Vinson is a resident of Columbus, Ohio who repeatedly purchased the Smucker PHVO Products for her own consumption.

12.     Plaintiff Lucina Caldera is a resident of Hacienda Heights, California who repeatedly purchased the Smucker PHVO Products for her own and her family's consumption.

CLASS ACTION COMPLAINT

**FACTS**

13.   Plaintiff Alice Vinson has purchased Crisco Original Shortening and Crisco Butter Flavor Shortening 5-6 times a year since at least January, 2000. Her most recent purchase of Crisco Original Shortening was early April 2012. Her most recent purchase of Crisco Butter Flavor Shortening was approximately July 2011.

14.   Ms. Vinson purchases Uncrustables about twice a year. Her most recent purchase of Uncrustables Sandwiches was approximately November 2011.

15.   Ms. Vinson's most recent purchase, as well as nearly all her purchases, were at Kroger, 850 South Hamilton Road, Columbus Ohio, 43213.

16.   Plaintiff Lucina Caldera regularly purchased the Smucker PHVO Products in various California stores during each year of the Class Period defined herein.

17.   Specifically, Ms. Caldera has purchased one or two units of Crisco Butter Flavor Shortening and/or Crisco Original Flavor Shortening per month. Her most recent purchase of Crisco Butter Flavor Shortening was in mid-May 2012, and her most recent purchase of Crisco Original Shortening was in April 2012.

18.   Ms. Caldera has purchased Uncrustables approximately ten times, most recently around May 2011 for a hiking trip.

19.   Ms. Caldera's most recent purchases were at Albertsons, 17120 Colima Road, Hacienda Heights, CA 91745, where she shops most frequently. However she has also bought the Smucker PHVO Products at the following stores:

       a.   Albertsons 13003 Whittier Blvd, Whittier, CA 90602;

       b.   Stater Brothers 11750 E. Whittier, Whittier, CA 90601;

       c.   Stater Brothers 14212 Mulberry Drive, Whittier, CA 90604;

       d.   Vons 2122 South Hacienda Blvd, Hacienda Heights, CA 91745;

       e.   Vons 15740 Laforge Street, Whittier, CA 90603;

       f.   Costco 17550 Castleton Street, City of Industry, CA 91748;

       g.   Ralphs 14919 Whittier Blvd, Whittier, CA 90605;

       h.   Ralphs 8510 Painter Avenue, Whittier, CA 90605; and

i.    Ralphs, Gale Street, Hacienda Heights, CA 91745 (location now closed).

20.    Plaintiffs first discovered Smucker's unlawful acts described herein in May, 2012, when they learned that the Smucker PHVO Products contained artificial trans fat, and caused heart disease, diabetes, cancer, and death.

21.    Plaintiffs, in the exercise of reasonable diligence, could not have discovered earlier Smucker's unlawful acts described herein because the dangers of artificial *trans* fats were known to Smucker, but not to them, throughout the Class Period defined herein. Plaintiffs are not nutritionists, food experts, or food scientists, but rather lay consumers who did not have the specialized knowledge that Smucker had, which otherwise would have enabled them to associate partially hydrogenated oil with artificial *trans* fat, and artificial *trans* fat with disease. Even today the nature and extensive utilization of artificial *trans* fats—including that they necessarily exist where partially hydrogenated oil is used as an ingredient in a food product—is generally unknown to the average consumer.

22.    When purchasing the Smucker PHVO Products during the Class Period, Plaintiffs read and relied on various health and wellness claims appearing on their packaging (as further described herein), which individually and especially in the context of their packaging as a whole, misleadingly implied that the Smucker PHVO Products are healthy. Plaintiffs would not have purchased these products absent these advertisements.

23.    Because Plaintiffs expected these statements to be true and honest when they are in fact false and misleading, they did not receive the benefit of their purchase. Instead of receiving the benefit of products free of trans fat or more healthful than butter, they received products that contained trans fat or far less healthful than butter.

**The Role of Cholesterol in Heart Disease**

24.    Cholesterol is a sterol, a subgroup of steroids, which are a class of organic molecule that occurs naturally in plants, animal and fungi.

25.    Cholesterol is a waxy, fat-like substance found in the body's cell walls. The

4

CLASS ACTION COMPLAINT

body uses cholesterol to make hormones, bile acids, vitamin D, and other substances. The body makes all the cholesterol it needs, which circulates in the bloodstream in packages called lipoproteins. There are two main kinds of lipoproteins, low density lipoprotein, or LDL, and high density lipoprotein, or HDL.

26.    LDL cholesterol is sometimes called "bad" cholesterol because it carries cholesterol *to* tissues, including the arteries. Most cholesterol in blood is LDL cholesterol. The higher the level of LDL cholesterol, the greater the risk for heart disease.

27.    HDL cholesterol is sometimes called "good" cholesterol because it takes cholesterol *away* from tissues to the liver, where it is removed from the body. A *low* level of HDL cholesterol increases the risk for heart disease.

28.    If there is too much cholesterol in the blood, some of the excess can become trapped in artery walls. Over time, this builds up and is called plaque. The plaque can narrow vessels and make them less flexible, a condition called atherosclerosis.

29.    This process can happen to the coronary arteries in the heart, which may restrict the provision of oxygen and nutrients to the heart, causing chest pain or angina. Moreover, some cholesterol-rich plaques can burst, causing a blood clot to form over the plaque, blocking blood flow through the artery and causing a heart attack.

30.    When atherosclerosis affects the coronary arteries, the condition is called coronary heart disease, and is sometimes referred to simply as "heart disease."

31.    The following represents total cholesterol, LDL cholesterol, and HDL cholesterol guidelines (measured as milligrams per deciliter of blood) promulgated by the U.S. Department of Health & Human Services, the National Institutes of Health, and the National Heart, Lung and Blood Institute:

///
///
///
///
///

CLASS ACTION COMPLAINT

| Total Cholesterol | |
|---|---|
| Less than 200 mg/dL | Desirable |
| 200-239 mg/dL | Borderline High |
| 240 mg/dL and above | High |
| **LDL Cholesterol** | |
| Less than 100 mg/dL | Optimal (Ideal) |
| 100-129 mg/dL | Near Optimal |
| 130-159 mg/dL | Borderline High |
| 160-189 mg/dL | High |
| 190 mg/dL and above | Very High |
| **HDL Cholesterol** | |
| Less than 40 mg/dL | Major Heart Disease Risk Factor |
| 50 mg/dL and above | Gives Some Protection Against Heart Disease |

32.    The consumption of saturated fat negatively affects blood cholesterol levels because the body reacts to saturated fat by producing cholesterol. This has a greater effect on cholesterol levels than the direct consumption of dietary cholesterol.

33.    But it is the consumption of *artificial trans fat* that has the most pernicious and dramatic effect on blood cholesterol of any known nutrient, because the consumption of trans fat *both* increases "bad" LDL cholesterol and decreases "good" HDL cholesterol.

**The Strong Evidence of Artificial Trans Fat's Health Hazards**

34.    Trans fat is naturally found in trace amounts in foods derived from ruminant animals, primarily in cow's milk and red meat.[1] It is also found in small quantities in human breast milk. Also known as vaccenic acid, natural trans fat has never been linked to any negative health effect in human beings and is chemically different from artificial

---

[1] Dariush Mozaffarian *et al., Trans Fatty Acids and Cardiovascular Disease*, 354 New Eng. J. Med. 1601, 1608 (2008).

CLASS ACTION COMPLAINT

trans fat. Initial studies on rats indicate that consumption of vaccenic acid is beneficial to health.[2]

35.     Artificial trans fat, by contrast, is manufactured via an industrial process called partial hydrogenation, in which hydrogen atoms are added to normal vegetable oil by heating the oil to temperatures above 400 degrees Fahrenheit in the presence of ion donor catalyst metals such as rhodium, ruthenium, and nickel.[3] The resulting product is known as partially hydrogenated vegetable oil, or PHVO, which is the main source of *trans* fat in the American diet and a major ingredient in the Smucker PHVO Products.

36.     PHVO was invented in 1901 and patented in 1902 by German chemist Wilhelm Normann. PHVO molecules chemically differ from the natural fat molecules in other food products. The industrial process that adds hydrogen ions to normal vegetable oil improves food texture and permits food products to withstand heavy mechanical processing and high temperatures.[4]

37.     Natural fat, except the trace amounts of natural trans fat from ruminant animals, comes in two varieties: (1) fats that lack carbon double bonds ("saturated fat") and (2) fats that have carbon double bonds with the hydrogen atoms on the same side on the carbon chain ("*cis*" fat"). Trans fat, however, has double bonds on opposite sides of its carbon chain.

---

[2]   Ye Wang *et al.*, *Trans-11 Vaccenic Acid Dietary Supplementation Induces Hypolipidemic Effects on JCR:LA-cp Rats*, 138 J. Nutrition 2117 (November 2008).

[3]   *See* Alice H. Lichtenstein, *Trans Fatty Acids, Plasma Lipid Levels, and Risk of Developing Cardiovascular Disease*, 95 Circulation 2588, 2588-90 (1997).

[4]   *See* Alberto Ascherio *et al.*, *Trans Fatty Acids & Coronary Heart Disease*, 340 New Eng. J. Med. 94, 94-8 (1999). *See also* Ctr. for Food Safety & Applied Nutrition, U.S. Food & Drug Admin., Questions & Answers About Trans Fat Nutrition Labeling (Update 2006) (2003), *available at* http://www.cfsan.fda.gov/%7Edms/qatrans2.html

CLASS ACTION COMPLAINT



38.     PHVO was initially a "wonder product" attractive to the packaged food industry because it combines the low cost of unsaturated *cis* fat with the flexibility and long shelf life of saturated fat. Like *cis* fat, PHVO is manufactured from lower-cost legumes,[5] while saturated fat is derived from relatively expensive animal and tropical plant sources.[6] Given its versatility, PHVO was recently used in 40 percent of processed packaged foods.[7]

39.     Artificial trans fat does not exist in nature, and the human body has not evolved to digest it. The same unusual and unnatural chemical structure that gives artificial trans fat properties attractive from an industrial perspective makes it highly toxic to human health.

40.     In particular, PHVO causes cardiovascular heart disease, diabetes, Alzheimer's disease/dementia, and cancer.

---

[5] e.g., corn oil, soybean oil, peanut oil

[6] e.g., butter, cream, tallow, coconut oil

[7] Mary Carmichael, *The Skinny on Bad Fat*, Newsweek, Dec. 1, 2003, at 66. *See also* Kim Severson, *Hidden Killer. It's **Trans** Fat. It's Dangerous. And It's In Food You Eat Every Day*, S.F. Chron., Jan. 30, 2002.

CLASS ACTION COMPLAINT

41.     While many packaged food manufacturers have removed PHVO from their products as its extreme damage to human health has become ever clearer, Smucker has chosen to continue to gravely harm its customers by continuing to use PHVO in its products.

- **Cardiovascular Disease**

42.     In a joint Dietary Guidelines Advisory Committee Report, the U.S. Department of Health and Human Services and the U.S. Department of Agriculture recognized **"[t]he relationship between trans fatty acid intake and LDL cholesterol is direct and progressive, increasing the risk of cardiovascular disease."**[8]

43.     Food products with artificial trans fat harm the heart by "rais[ing] the concentration of the most dangerous form of serum cholesterol (LDL cholesterol)" and "lower[ing] a protective form of serum cholesterol (HDL cholesterol)."[9]

44.     The American Heart Association notes that, **"trans fats raise your bad (LDL) cholesterol levels and lower your good (HDL) cholesterol levels. Eating trans fats increases your risk of developing heart disease."**[10]

45.     After an extensive evaluation of the scientific literature on the connection between the consumption of artificial trans fat and coronary heart disease, the FDA concluded:

> [B]ased on the consistent results across a number of the most persuasive types of study designs (i.e., intervention trials and prospective cohort studies) that were conducted using a range of test conditions and across different geographical regions and populations . . . the available evidence for

---

[8] Dep't of Health & Human Serv. & U.S. Dep't of Agric., 2005 Dietary Guidelines Advisory Committee Report, Section 10 (2005).

[9] *Id.*

[10]     Am. Heart Ass'n., *Trans Fat Overview*, *available at* http://www.americanheart.org/presenter.jhtml?identifier=3045792.

CLASS ACTION COMPLAINT

an adverse relationship between trans fat intake and CHD risk is strong.[11]

46.    In December 2010, the FDA further noted that **"[t]o date, there have been no reports issued by authoritative sources that provide a level of *trans* fat in the diet . . . below which there is no risk of [Coronary Heart Disease]."** 75 Fed. Reg. 76526, 76542 (Dec. 8, 2010). Rather, there **"is a positive linear trend between *trans* fatty acid intake and LDL cholesterol concentration, and therefore there is a positive relationship between *trans* fatty acid intake and the risk of CHD."** *Id.*

47.    Trans fat raises the risk of CHD more than any other known nutritive product.[12]

48.    Removing 2% of daily calories from trans fat from the American diet "would prevent approximately 30,000 premature coronary deaths per year, and epidemiologic evidence suggests this number is closer to 100,0000 premature deaths annually."[13]

49.    A study on the impact of trans fatty acids on heart health provides evidence that:

> [E]ven the lower estimates from the effects [of PHVO] on blood lipids would suggest that more than 30,000 deaths per year may be due to the consumption of partially hydrogenated vegetable fat. Furthermore, the number of attributable cases of nonfatal coronary heart disease will be even larger.[14]

---

[11] Ctr. for Food Safety & Applied Nutrition, U.S. Food & Drug Admin., Questions & Answers About Trans Fat Nutrition Labeling.

[12] Mozaffarian, 354 New Eng. J. Med. at 1603.

[13] Alberto Ascherio *et al*., *Trans Fatty Acids & Coronary Heart Disease*, 340 New Eng. J. Med. 94, 94-8 (1999).

[14] W.C. Willett *et al., Trans Fatty Acids: Are the Effects only Marginal?* 84 Am. J. Pub. Health  722, 723 (1994).

50.     Since "the adverse effect of trans fatty acids is stronger than that of saturated fatty acids," saturated fat consumption would need to be reduced by 10 percent of caloric intake to have the same impact.[15]

51.     "10 to 19 percent of CHD events in the United States could be averted by reducing the intake of trans fat."[16]

52.     By raising LDL levels and lowering HDL levels, trans fat causes a wide variety of dangerous heart conditions, including low flow-mediated vasodilation, coronary artery disease, and primary cardiac arrest.

53.     After conducting a crossover diet trial, Danish researchers determined that healthy men and women who maintained a high-trans fat diet had 21 percent lower protective HDL levels and 29 percent lower flow-mediated vasodilation ("FMD") than those on a high-saturated fat diet. FMD measures the percent increase between the diameter of the artery at ordinary and at maximum dilation, and low FMD is "a risk marker of coronary heart disease.[17]

54.     Australian researchers observed that heart attack patients possess elevated amounts of trans fat in their adipose tissue, strongly linking heart disease with long-term consumption of trans fat.[18]

55.     By taking blood samples from 179 survivors of cardiac arrest and 285 randomly-selected control patients and comparing the top fifth with the bottom fifth of participants by trans fat intake, another study published in the American Heart

[15] Mozaffarian, 354 New Eng. J. Med. at 1609.

[16] *See id.* at 1611.

[17] Nicole M. De Roos *et al.*, *Replacement of Dietary Saturated Fatty Acids by Trans Fatty Acids Lowers Serum HDL Cholesterol and Impairs Endothelial Function in Healthy Men and Women*, 21 Am. Heart Assoc. 1233, 1233-37 (2001).

[18] Peter M. Clifton *et al.*, *Trans Fatty Acids In Adipose Tissue And The Food Supply Are Associated With Myocardial Infarction*. 134 J. of Nutrition 874, 874-79 (2004).

CLASS ACTION COMPLAINT

Association's *Circulation* found that the largest consumers of trans fat have three times the risk of suffering primary cardiac arrest, even after controlling for a variety of medical and lifestyle risk factors.[19]

- **Type 2 Diabetes**

56.     Artificial trans fat causes type 2 diabetes.[20]

57.     In particular, trans fat disrupts the body's glucose and insulin regulation system by incorporating itself into cell membranes, causing the insulin receptors on cell walls to malfunction, and in turn elevating blood glucose levels and stimulating further release of insulin.

58.     Researchers at Northwestern University's medical school found mice show multiple markers of type 2 diabetes after eating a trans fat diet for only four weeks. By the eighth week of the study, mice fed the diet high in trans fat showed a 500% increase compared to the control group in hepatic interleukin-1β gene expression, one such marker of diabetes, indicating the extreme stress artificial trans fat places on the body.[21]

59.     A 14-year study of 84,204 women found that for every 2 percent increase in energy intake from artificial trans fat, the relative risk of type 2 diabetes was 1.39. In other words, each 2 percent of calories from artificial trans fat increases the risk of type 2 diabetes by 39 percent.[22]

- **Breast, Prostate, and Colorectal Cancer**

60.     Trans fat is a carcinogen and causes breast, prostate, and colorectal cancer.

---

[19] Rozenn N. Lemaitre *et al.*, *Cell Membrane Trans-Fatty Acids and the Risk of Primary Cardiac Arrest*, 105 Circulation 697, 697-701 (2002).

[20] Am. Heart Ass'n., *Trans Fat Overview*.

[21] Sean W. P. Koppe *et al.*, *Trans fat feeding results in higher serum alanine aminotransferase and increased insulin resistance compared with a standard murine high-fat diet*, 297 Am. J. Physiol. Gastroint Liver Physiol. G378-84 (2009).

[22] Jorge Salmeron *et al.*, *Dietary Fat Intake and Risk of Type 2 Diabetes in Women*, 73 Am. J. of Clinical Nutrition 1019, 1023 (2001).

61.     A 13-year study of 19,934 French women showed 75 percent more women contracted breast cancer in the highest quintile of trans fat consumption than did those in the lowest.[23]

62.     In a 25-year study of 14,916 U.S. physicians, the doctors in the highest quintile of trans fat intake had over a 100% greater risk of developing prostate cancer than the doctors in the lowest quintile.[24]

63.     A study of 1,012 American males observing trans fat intake and the risk of prostate cancer found "[c]ompared with the lowest quartile of total trans-fatty acid consumption, the higher quartiles gave odds ratios (ORs) equal to 1.58," meaning those in the highest quartile are 58% more likely to contract prostate cancer than those in the lowest.[25]

64.     A 600-person study found an 86 percent greater risk of colorectal cancer in the highest trans fat consumption quartile.[26]

65.     A 2,910-person study found "trans-monounsaturated fatty acids . . . were dose-dependently associated with colorectal cancer risk," which showed "the importance of type of fat in the etiology and prevention of colorectal cancer."[27]

66.     There is no health benefit to artificial trans fat consumption and "no safe

---

[23] Véronique Chajès *et al.*, *Association between Serum Trans-Monounsaturated Fatty Acids and Breast Cancer Risk in the E3N-EPIC Study.* 167 Am. J. of Epidemiology 1312, 1316 (2008).

[24] Jorge Chavarro *et al.*, *A Prospective Study of Blood Trans Fatty Acid Levels and Risk of Prostate Cancer.*, 47 Proc. Am. Assoc. of Cancer Research 95, 99 (2006).

[25] Xin Liu *et al.*, *Trans-Fatty Acid Intake and Increased Risk of Advanced Prostate Cancer: Modification by RNASEL R462Q Variant*, 28 Carcinogenesis 1232, 1232 (2007).

[26] L.C. Vinikoor *et al.*, *Consumption of Trans-Fatty Acid and its Association with Colorectal Adenomas*, 168 Am. J. of Epidemiology 289, 294 (2008).

[27] Evropi Theodoratou *et al.*, *Dietary Fatty Acids and Colorectal Cancer: A Case-Control Study*, 166 Am. J. of Epidemiology 181 (2007).

CLASS ACTION COMPLAINT

level" of artificial trans fat intake.[28]

67.     According to the established consensus of the scientific community, consumers should keep their consumption of trans fat "as low as possible."[29]

68.     As Dr. Dariush Mozaffarian notes in the New England Journal of Medicine:

[T]rans fats from partially hydrogenated oils have no intrinsic health value above their caloric value. Thus from a nutritional standpoint, the consumption of trans fatty acids results in considerable potential harm but no apparent benefit. . . . Thus, complete or near-complete avoidance of industrially produced trans fat—a consumption of less than 0.5 percent of the total energy intake—may be necessary to avoid adverse effects and would be prudent to minimize health risks.[30]

69.     The serious health conditions caused by trans fat consumption only occur from consuming artificial trans fat, not the trace natural trans fat (vaccenic acid) found in ruminant sources:

Of four prospective studies evaluating the relation between the intake of trans fatty acids from ruminants and the risk of CHD, none identified a significant positive association, whereas three identified nonsignificant trends toward an inverse association. . . . [T]he sum of the current evidence suggests that the public health implications of consuming trans fats from ruminant products are relatively limited.[31]

---

[28]   Food & Nutrition Bd., Inst. of Med., Dietary Reference Intakes For Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids (2005).

[29] *Id.*

[30] Mozaffarian, 354 New Eng. J. Med. at 1608-1609.

[31] *Id.*

CLASS ACTION COMPLAINT

**There is a Well-Established Scientific Consensus That Trans Fat is Extremely Harmful**

70.     There is "no safe level" of *trans* fat intake.[32] In addition, "*trans* fatty acids are not essential and provide no known benefit to human health." 75 Fed. Reg. at 76542. Thus, while "the [Institute of Medicine] sets tolerable upper intake levels (UL) for the highest level of daily nutrient intake that is likely to pose no risk of adverse health effects to almost all individuals in the general population[,] . . . the IOM does ***not*** set a UL for *trans* fatty acid because ***any*** incremental increase in *trans* fatty acid intake increases the risk of CHD." *Id.* (emphasis added). In addition, while "*trans* fats are naturally occurring in some foods that contribute essential nutrients . . . [such that] consuming zero percent of energy as *trans* fat would require substantial adjustments to the diet that may have undesirable effects," the FDA's "[r]ecommendations are for Americans to limit *trans* fat consumption as much as possible while consuming a nutritionally adequate diet." *Id.* (citations omitted).

71.     According to the established consensus of the scientific community, consumers should keep their consumption of *trans* fat "as low as possible."[33]

72.     Today there is no question about the scientific consensus on trans fat:

> The scientific rationale for eliminating exposure to artificial trans fatty acids in foods is rock solid. There is no evidence that they provide any health benefit, and they are certainly harmful. These compounds adversely affect both low- and high-density lipoprotein cholesterol levels and increase the risk for coronary heart disease, even at relatively low levels of dietary intake. Gram for gram, trans fats are far more potent than saturated fats in

---

[32]  Food & Nutrition Bd., Inst. of Med., Dietary Reference Intakes For Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids (2005).

[33] *Id.*

CLASS ACTION COMPLAINT

increasing the risk for heart disease, perhaps because they also have pro-inflammatory properties and other adverse effects on vascular endothelium. The strong evidence of harm motivated the Institute of Medicine to issue recommendations that the intake of trans fats be minimized and prompted the [FDA] to require the addition of information about trans fat content to food labels beginning in 2006. Eliminating exposure to these dangerous fats could have a powerful population impact—potentially protecting 30,000 to 100,000 Americans from death related to heart disease each year.[34]

73.     Dr. Walter Willett, Professor of Medicine at Harvard Medical School, has concluded:

Given the adverse effects of trans fatty acids on serum lipid levels, systemic inflammation, and possibly other risk factors for cardiovascular disease and the positive associations with the risk of CHD, sudden death from cardiac causes, and possibly diabetes, the potential for harm is clear. The evidence and the magnitude of adverse health effects of trans fatty acids are in fact far stronger on average than those of food contaminants or pesticide residues, which have in some cases received considerable attention. Furthermore, trans fats from partially hydrogenated oils have no intrinsic health value above their caloric value. Thus, from a nutritional standpoint, the consumption of trans fatty acids results in considerable potential harm but no apparent benefit.[35]

**Because of Trans Fat's Harms, the Substance is Being Increasingly Banned Throughout the Nation and World**

---

[34] Julie Louise Gerberding, MD, MPH, *Safer Fats for Healthier Hearts: The Case for Eliminating Dietary Artificial Trans Fat Intake*, Ann. Intern. Med., 151:137-138 (2009)

[35] Dariush Mozaffarian, M.D., M.P.H., Martijn B. Katan, Ph.D., Alberto Ascherio, M.D., Dr.P.H., Meir J. Stampfer, M.D., Dr.P.H., and Walter C. Willett, M.D., Dr.P.H., *Trans Fatty Acids and Cardiovascular Disease*, N. Engl. J. Med. 354:1601-13 (2006).

74.     In 2008, California became the first state to ban all restaurant food with artificial trans fat, a law affecting approximately 88,000 eating establishments. Trans fats now may not be served in California's schools or restaurants, Cal. Educ. Code § 49431.7, Cal. Health & Saf. Code § 114377.

75.     New York City banned all trans fat in its 20,000 food establishments in 2006. Similar laws exist in Philadelphia; Baltimore; Stamford, Connecticut; and Montgomery County, Maryland.

76.     A 2004 Danish law restricted all foods to under 2 percent of calories from trans fat. Switzerland made the same restriction in 2008.[36]

77.     After conducting a surveillance study of Denmark's trans fat ban, researchers concluded the change "did not appreciably affect the quality, cost or availability of food" and did not have "any noticeable effect for the consumers."[37]

78.     In 2006, a trans fat task force co-chaired by Health Canada and the Heart and Stroke Foundation of Canada recommended capping trans fat content at 2 percent of calories for tub margarines and spreads and 5 percent for all other foods. On September 30, 2009, British Columbia became the first province to impose these rules on all restaurants, schools, hospitals, and special events.[38]

## SPECIFIC MISREPRESENTATIONS, MATERIAL
## OMISSIONS, AND DECEPTIVE ACTS

**Crisco Original & Butter Flavor Shortening**

79.     During the Class Period, both Crisco Original Shortening and Crisco Butter

---

[36] Andrew Collier, *Deadly Fats: Why Are We still Eating Them?*, The Independent (UK), June 10, 2008.

[37] Mozaffarian, 354 New Eng. J. Med. at 1610; *see also* High Levels of Industrially Produced Trans Fat in Popular Fast Food, 354 New Eng. J. Med. 1650, 1652 (2006).

[38] *Province Restricts Trans Fat in B.C.*, British Columbia Ministry of Healthy Living and Sport Press Release (2009), *available at* http://www2.news.gov.bc.ca/news_releases_2005-2009/2009HLS0013-000315.htm.

Flavor Shortening were made with PHVO yet contained deceptive health and wellness claims. Photos of the packaging of each product are attached hereto as **Exhibit A**.

80.   During the Class Period, Crisco Original Shortening and Crisco Butter Flavor Shortening were identically formulated except for the addition of artificial butter flavoring to Crisco Butter Flavor Shortening. Similarly, during the Class Period, the packaging of Crisco Original Shortening and Crisco Butter Flavor Shortening were identical except for their background color (blue and yellow/gold, respectively) and name (e.g., the use of "Butter Flavor" in the name of the latter product). Both products were sold in both can and stick forms.

81.   Crisco Original Shortening and Crisco Butter Flavor Shortening, in both can and stick form, are referred to herein collectively as "Crisco."

82.   **Deceptive and misleading comparison to butter:** The Crisco label states: "50% Less Saturated Fat Than Butter," and "USE INSTEAD OF BUTTER OR MARGARINE FOR BAKING." Crisco also contained a misleading "Saturated Fat Comparison" chart comparing the saturated fat content of butter to Crisco. These representations, individually and especially when taken together in the context of the packaging as a whole, misleadingly imply that Crisco is a more healthful alternative to butter because of its lower saturated fat content. But Crisco contains dangerous levels of artificial *trans* fat, which is far more harmful to health than saturated fat, whereas butter contains ***no*** artificial *trans* fat.

83.   In comparing Crisco's saturated fat content to butter, Smucker deceptively omits its artificial trans fat content.

84.   **False and misleading "All-Vegetable" claim:** Vegetables are natural. Crisco's label represents that the product is "All-Vegetable." This representation is misleading because, while the ingredients in Crisco did in fact originate as oil derived from highly processed palm and soybean, the process of hydrogenation as described above renders them artificial non-vegetable products, including a large amount of artificial trans fat, which is a chemical that does not exist in vegetables.

**Uncrustables Sandwiches**

85.     During the Class Period, Smucker's Uncrustables frozen sandwiches were made with PHVO yet contained deceptive health and wellness claims, including at least the following varieties: (a) Peanut Butter & Grape Jelly on White Bread; (b) Peanut Butter & Grape Jelly on White Whole Wheat Bread; (c) Peanut Butter & Grape Jelly on Whole Wheat Bread; (d) Peanut Butter & Strawberry Jam on White Bread; (e) Peanut Butter & Strawberry Jam on White Whole Wheat Bread; (f) Peanut Butter & Strawberry Jam on Whole Wheat Bread; (g) Peanut Butter & Honey Spread on Wheat Bread; (h) Peanut Butter Sandwich on White Bread; and (i) Grilled Cheese Sandwich on White Bread (collectively referred to herein as "Uncrustables"). Each variety was sold in various sizes, for example, 4-pack, 8-pack, and 10-pack. Exemplars of the packaging for each product are attached hereto as **Exhibit B**.

86.     **Misleading "Wholesome" and "Goodness" claims:** During the Class Period and through at least April 2011, Smucker marketed Uncrustables with the taglines of "Mom's love 'em because they're wholesome" and Uncrustables "seal in the homemade goodness of PB&J" or provide "golden goodness" (Grilled Cheese).

87.     This language was part of an intentional campaign to deceptively market Uncrustables as healthful and nutritionally comparable to homemade PB&J sandwiches.

88.     Smucker's conduct is especially egregious because a peanut butter & jelly sandwich, an American child's dietary staple, contains no *trans* fat and does not pose the serious health consequences to children associated with Uncrustables. Smucker claims its product has "the homemade goodness of PB&J." However, neither bread, nor peanut butter, nor jelly, contain artificial *trans* fat, which renders Uncrustables dangerous for children's health.

89.     These claims are also misleading in light of Uncrustables' high fructose corn syrup ("HFCS") content.

90.     HFCS is a highly refined manufactured food additive linked to tooth decay, childhood obesity, type-2 diabetes, and heart disease.

CLASS ACTION COMPLAINT

91.    Far from "wholesome," Smucker's use of HFCS gives Uncrustables Sandwiches a very high glycemic index value, meaning that almost immediately upon consumption it is digested into glucose and released into the blood stream. High levels of blood glucose are toxic to a number of organs, so the body then releases the hormone insulin as a response to lower blood sugar. When this process is repeated over time, cells that normally react to insulin and absorb excess blood sugar become sensitized and partially resistant to insulin. This partial insulin resistance is variously referred to as metabolic syndrome, insulin resistance syndrome, and pre-diabetes. Type-2 diabetes eventually results.

92.    More immediately, the HFCS content leads children who consume Uncrustables Sandwiches to experience a sugar "high," during which they will tend to be hyperactive and a subsequent "crash" or "low," during which they will be tired, moody, irritable, and even depressed.

93.    **Misleading "Whole Wheat" and "Whole Grain" claims:** Varieties of Uncrustables on Whole Wheat bread also contain packaging representations of "Whole Wheat" and "Whole Grain" (more specifically, "Whole Grain, 16g or more per package," as part of a "stamp" or "seal" from the Whole Grains Council (WGC), a purported "nonprofit consumer advocacy group," comprised of hundreds of food manufacturers like Cargill, ConAgra, Domino's Pizza, Frito-Lay, General Mills, Heinz, Hostess, Kellogg, Kraft, McDonald's, Nestle, Quaker, and Smucker. *See* http://www.wholegrainscouncil.org/about-us).

94.    These representations give a misleading impression that Uncrustables is healthy, while Smucker at the same time deceptively omits Uncrustables' PHVO and HFCS content.

95.    Smucker's conduct was especially egregious, insidious and immoral because it marketed Uncrustables to children and primarily for children's consumption.

## RELIANCE AND INJURY

96.    When purchasing the Smucker PHVO Products, Plaintiffs were seeking for

CLASS ACTION COMPLAINT

themselves and their families, products of particular qualities, including products that did not negatively affect blood cholesterol levels or the health of their cardiovascular system, and products made with natural, healthy ingredients.

97.   Plaintiffs read and relied on, for their Smucker PHVO Product purchases, the products' respective packaging and the health and wellness message it conveyed, which was a substantial factor in each of their purchases.

98.   Specifically, Plaintiffs relied on statements that Crisco is "All-Vegetable," contains "50% Less Saturated Fat Than Butter," a graphic bar chart comparing Crisco's saturated fat content to butter, and Smucker's instruction to "USE INSTEAD OF BUTTER OR MARGARINE FOR BAKING."

99.   For their Uncrustables purchases, Plaintiffs relied on statements that Uncrustables are "wholesome" and made with "homemade goodness."

100.   Plaintiffs were further injured by Smucker's omission of information that would have been important to their purchasing decision. Specifically, in light of Crisco's message that it is healthier than butter because of its lower saturated fat content, Smucker deceptively omitted the presence of artificial trans fat in Crisco and its far more pernicious effect on health, which is important to a reasonable consumer. Smucker had a duty to disclose this information because, *inter alia*, it made affirmative misrepresentations.

101.   Similarly, for Uncrustables, in light of Crisco's message that it is a "wholesome" product for children, made with "homemade goodness," Smucker deceptively omitted the presence of artificial trans fat and its effect on human health, especially that of the young, developing children that Smucker targets.

102.   Plaintiffs  purchased the Smucker PHVO Products believing they had the qualities they sought based on the products' deceptive labeling, but the products were actually unsatisfactory to them for the reasons described herein.

103.   The Smucker PHVO Products cost more than similar products without misleading labeling, and would have cost less, for example demanded less in the

marketplace, absent Smucker's false and misleading statements and material omissions. Thus, the Smucker PHVO Products were worth less than what Plaintiffs paid for them.

104. Plaintiffs, on one or more occasions, would not have purchased the Smucker PHVO Products absent Smucker's misrepresentations.

105. Plaintiffs purchased the Smucker PHVO Products instead of competing products based on the false statements and misrepresentations described herein.

106. Plaintiffs lost money as a result of Smucker's unlawful behavior. Plaintiffs altered their position to their detriment and suffered loss in an amount equal to the amount they paid for the Smucker PHVO Products.

## **DELAYED DISCOVERY**

107. Plaintiffs did not discover that Smucker's labeling of the Smucker PHVO Products was false, deceptive, or misleading until late May 2012, when they learned that foods high in *trans* fat—such as the Smucker PHVO Products—are harmful to human health because of their role in causing coronary heart disease, type-2 diabetes, and cancer. Until this time, they lacked knowledge regarding the facts of their claims against Smucker.

108. Plaintiffs are reasonably diligent consumers who exercised reasonable diligence in their purchasing, use, and consumption of the Smucker PHVO Products. Nevertheless, they would not have been able to discover Smucker's deceptive practices and lacked the means to discover them given that, like nearly all consumers, they are not experts on nutrition and do not typically read or have access to scholarly journals such as The Journal of Nutrition,[39] The European Journal of Clinical Nutrition,[40] and The New

---

[39] Peter M. Clifton *et al.*, *Trans Fatty Acids In Adipose Tissue And The Food Supply Are Associated With Myocardial Infarction*. 134 J. of Nutrition 874, 874-79 (2004).

[40] A. Tavani *et al*. *Margarine intake and risk of nonfatal acute myocardial infarction in Italian women*. Eur. J. Clin. Nutr. 51: 30–32 (1997) (estimating a 50percent greater risk of heart attack in women with high consumption of margarine, an association "independent of body mass index, history of hypertension and hyperlipidemia.")

CLASS ACTION COMPLAINT

England Journal of Medicine,[41] where the scientific evidence of artificial *trans* fat's dangers has been published. Furthermore, Smucker's labeling practices—in particular, representing Crisco as "50% Less Saturated Fat Than Butter" and that purchasers should "Use Instead of Butter or Margarine For Baking"—actively impeded Plaintiffs' and the Classes' abilities to discover the dangerous effects of the Smucker PHVO Products throughout the Class Period.

## CLASS ACTION ALLEGATIONS

109.  Plaintiffs bring this action on behalf of themselves and all others similarly situated on behalf of the following Classes, all of which exclude officers, directors, and employees of Smucker, and the Court, its officers and their families, as well as those who purchased the Smucker PHVO Products for commercial sale or distribution, rather than household or personal use:

- **The Nationwide Class**

   a.   The Nationwide Class arises under Ohio Law as alleged herein and has both Ms. Vinson and Ms. Caldera as its Class Representatives, who seek on behalf of the Nationwide Class remedies available under Ohio law, including but not limited to actual damages, restitution, punitive damages, attorneys' fees and costs, and injunctive relief. It is comprised of the following two subclasses:

   The Nationwide Crisco Subclass - All persons who purchased in the United States, on or after February 1, 2000, for personal or household use and not for resale, Crisco Original Shortening or Crisco Butter Flavor Shortening.

   The Nationwide Uncrustables Subclass - All persons who purchased in the United States, between February 1, 2000 and April 30, 2011, for

---

[41] "10 to 19 percent of CHD events in the United States could be averted by reducing the intake of trans fat." 354 New Eng. J. Med. at 1611.

CLASS ACTION COMPLAINT

personal or household use and not for resale, Uncrustables Sandwiches.

- **The California Class**

    b.    The California Class arises under California law alleged herein and has Ms. Caldera as its Class Representative, who seeks on behalf of the California Class remedies available under California law, including but not limited to restitution, attorneys' fees and costs, and injunctive relief. It is comprised of the following two subclasses:

The California Crisco Subclass - All persons who purchased in the United States, on or after February 1, 2000, for personal or household use and not for resale, Crisco Original Shortening or Crisco Butter Flavor Shortening.

The California Subclass - All persons who purchased in the United States, between February 1, 2000 and April 30, 2011, for personal or household use and not for resale, Uncrustables Sandwiches.

110.   Questions of law and fact common to Plaintiffs and the Classes include:

a.    Whether Smucker communicated a health and wellness message through Crisco's packaging;

b.    Whether that message was material, or likely to be material, to a reasonable consumer;

c.    Whether that message was false, at variance with the truth, misleading, likely to deceive, and/or had the capacity to deceive the public and/or a reasonable consumer;

d.    Whether Smucker fraudulently omitted material information in advertising Crisco as healthy;

e.    For the Nationwide Crisco Subclass, whether the class is entitled to actual damages, restitution, rescission, punitive damages, attorneys' fees and costs, injunctive, and/or any other relief;

f.    For the California Crisco Subclass, whether the class is entitled

CLASS ACTION COMPLAINT

to restitution, attorneys' fees and costs, injunctive, and/or any other relief;

g.      Whether Smucker communicated a health and wellness message through Uncrustables' packaging;

h.      Whether that message was material, or likely to be material, to a reasonable consumer;

i.      Whether that message was false, at variance with the truth, misleading, likely to deceive, and/or had the capacity to deceive the public and/or a reasonable consumer;

j.      Whether Smucker fraudulently omitted material information in advertising Uncrustables as healthy;

k.      Whether any applicable statute of limitations should be tolled on behalf of one or more of the Classes or Subclasses;

l.      For the Nationwide Uncrustables Subclass, whether the class is entitled to actual damages, restitution, rescission, punitive damages, attorneys' fees and costs, injunctive, and/or any other relief;

m.      For the California Uncrustables Subclass, whether the class is entitled to restitution, attorneys' fees and costs, injunctive, and/or any other relief;

n.      Whether Smucker's conduct constitutes violations of the California UCL and FAL;

o.      Whether Smucker's conduct was immoral, unscrupulous or offensive of public policy because Smucker advertised Uncrustables to children and targeted children as Uncrustables' primary consumer despite knowing of the dangers from its artificial trans fat content.

p.      Whether Smucker's conduct constitutes violations of the California CLRA;

q.      Whether Smucker's conduct constitutes violations of the Ohio CSPA;

CLASS ACTION COMPLAINT

r. Whether Smucker's conduct constitutes violations of the Ohio DSPA;

s. Whether Smucker's conduct constitutes a breach of an express warranty;

t. Whether Smucker's conduct constitutes a breach of an implied warranty;

u. Whether Smucker acted willfully, recklessly, negligently, or with gross negligence in the violations of law alleged herein; and

111. By purchasing and/or using the Smucker PHVO Products, all Class members were subjected to the same wrongful conduct.

112. Absent Smucker's material deceptions, misstatements, and omissions, Plaintiffs and other Class members would not have purchased the Smucker PHVO Products.

113. Plaintiffs' claims are typical of the Classes' claims. Plaintiffs will fairly and adequately protect the interests of the Classes, have no interests that are incompatible with the interests of the Classes, and have retained counsel competent and experienced in class litigation.

114. The Classes are sufficiently numerous, as they each include hundreds of thousands of individuals who purchased the Smucker PHVO Products throughout the United States.

115. Class representation is superior to other options for the resolution of the controversy. The relief sought for each Class member is small. Absent the availability of class action procedures, it would be infeasible for Class members to redress the wrongs done to them.

116. Smucker has acted on grounds applicable to the Classes, thereby making appropriate final injunctive relief or declaratory relief concerning the Classes as a whole.

117. Questions of law and fact common to the Classes predominate over any questions affecting only individual members.

CLASS ACTION COMPLAINT

118.   Class treatment is appropriate under FRCP 23(a) and both FRCP 23(b)(2) and 23(b)(3). Plaintiffs do not contemplate class notice if the class is certified under FRCP 23(b)(2), which does not require notice, and notice via publication if the class is certified under FRCP 23(b)(3) or if the Court determines class notice is required notwithstanding that notice is not required under FRCP 23(b)(2). Plaintiffs will, if notice is required, confer with Defendant and seek to present the Court with a stipulation and proposed order on the details of a class notice plan.

## FIRST CAUSE OF ACTION

### Ohio Consumers Sales Practice Act, O.R.C. §1345.02

### (On behalf of the Nationwide Class)

119.   Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

120.   Plaintiffs' first cause of action is for damages and all other appropriate legal, injunctive and equitable relief based on an unfair or deceptive consumer sales practice on behalf of the national class as defined above.

121.   Plaintiffs are consumers as defined by Ohio Revised Code § 1345.01(D).

122.   Smucker is a supplier as defined by Ohio Revised Code §1345.01(C).

123.   Smucker's conduct described herein involves consumer transactions as defined in Ohio Revised Code §1345.01(A).

124.   O.R.C. §1345.02 prohibits any "unfair or deceptive act[s] or practice[s] in connection with a consumer transaction."

125.   Smucker violated and continues to violate the CSPA by engaging in the following practices proscribed by Ohio Revised Code §1345.02 in consumer transactions with the Plaintiffs and the Class, which were intended to result in, and did result in, the sale of the Smucker PHVO Products:

    a.   § 1345.02(A): Committing an unfair or deceptive act or practice in connection with the sale of the Smucker PHVO Products;

b.      § 1345.02(B)(1): Representing that the Smucker PHVO Products have performance characteristics, uses, or benefits that it does not have;

c.      § 1345.02(B)(2): Representing that the Smucker PHVO Products are of a particular standard, quality, or grade when it is not; and

d.      § 1345.02(B)(5): Representing that the Smucker PHVO Products are being supplied in accordance with a previous representation when they are not.

126.   Pursuant to Ohio Revised Code §1345.09(A), Plaintiffs and the Class are entitled to rescind the consumer transactions.

127.   Pursuant to Ohio Revised Code §1345.09(D), Plaintiffs and the Class seek an order enjoining the above-described wrongful acts and practices of the Defendant and for restitution and disgorgement.

128.   Pursuant to Section 1345.09(E), this Complaint will be served upon the Honorable Richard Michael DeWine.

129.   Plaintiffs and the Class reserve the right to allege further violations of Ohio's CSPA as Smucker's conduct is ongoing.

## SECOND CAUSE OF ACTION

### Ohio Consumers Sales Practice Act, O.R.C. §1345.03

### (On behalf of the Nationwide Class)

130.   Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

131.   Plaintiffs' second cause of action is for an unconscionable consumer sales practice on behalf of the national class defined above.

132.   Plaintiffs are consumers as defined by Ohio Revised Code § 1345.01(D).

133.   Smucker is a supplier as defined by Ohio Revised Code §1345.01(C).

134.   Smucker's conduct described herein involves consumer transactions as defined in Ohio Revised Code §1345.01(A).

135.   O.R.C. §1345.03 prohibits any "unconscionable act[s] or practice[s] in connection with a consumer transaction."

136.   Smucker violated and continues to violate the CSPA by engaging in the following practices proscribed by Ohio Revised Code §1345.03 in consumer transactions with the Plaintiffs and the Class, which were intended to result in, and did result in, the sale of the Smucker PHVO Products:

a.   § 1345.03(A): Engaging in an unconscionable act or practice in connection with the sale of the Smucker PHVO Products;

b.   § 1345.03(B)(3): Knowing, at the time of the sale of the Smucker PHVO Products, of the inability of Plaintiffs and the Class to receive a substantial benefit from the Smucker PHVO Products; and

c.   § 1345.03(B)(6): Knowingly making a misleading statement of opinion on which Plaintiffs and the Class were likely to rely to their detriment.

137.   Pursuant to Ohio Revised Code §1345.09(A), Plaintiffs and the Class are entitled to rescind the consumer transactions.

138.   Pursuant to Ohio Revised Code §1345.09(D), Plaintiffs and the Class seek an order enjoining the above-described wrongful acts and practices of the Defendant and for restitution and disgorgement.

139.   Pursuant to Section 1345.09(E), this Complaint will be served upon the Ohio Attorney General, Marc DeWine.

140.   Plaintiffs and the Class reserve the right to allege further violations of Ohio's CSPA as Smucker's conduct is ongoing.

## THIRD CAUSE OF ACTION

### Ohio Deceptive Trade Practices Act, O.R.C. §4165.02

### (On behalf of the Nationwide Class)

141.   Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

142.   Smucker is a person as defined in Ohio Revised Code §4165.01(D).

143.   As described above, Smucker has engaged in unfair, deceptive, untrue and misleading advertising in violation of Ohio's Deceptive Trade Practices Act §4165.02.

Smucker's policies, acts and practices violated and continue to violate the following sections of the DTPA:

       a.    §4165(A)(2): Using deceptive representations  in connection with goods;

       b.    §4165(A)(7): Representing that goods have sponsorship, approval, characteristics, ingredients, uses, benefits that they do not have;

       c.    §4165(A)(9): Representing that goods are of a particular standard, quality, or grade when they are of another; and

       d.    §4165(A)(11): Advertising goods with intent not to sell them as advertised.

144.   Plaintiffs and the Class reserve the right to allege other violations of the law under Ohio's Deceptive Trade Practices Act as Smucker's conduct is ongoing.

145.   Smucker's conduct caused and continues to cause substantial injury to Plaintiffs and the other Class members. Plaintiffs have suffered injury in fact and have lost money as a result of Smucker's deceptive conduct.

146.   Plaintiffs and the class seek equitable relief and to enjoin Smucker on the terms that the Court considers reasonable.

CLASS ACTION COMPLAINT

## **FOURTH CAUSE OF ACTION**

### **California Unfair Competition Law, Unlawful Prong**

### **Bus. & Prof. Code §§ 17200 *et seq*.**

### **(On behalf of the California Class)**

147. Plaintiff Caldera realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

148. Smucker has made and distributed, in interstate commerce and in this District, products that make false or misleading statements of fact regarding their content. The Smucker PHVO Products were placed into interstate commerce by Smucker and sold throughout the country and this District.

149. Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

150. The acts, omissions, misrepresentations, practices, and non-disclosures of Smucker as alleged herein constitute "unlawful" business acts and practices in that Smucker's conduct violates the California False Advertising Law, the California Consumer Legal Remedies Act, the Ohio Consumer Sales Practice Act and the Ohio Deceptive Trade Practices Act.

151. Smucker's conduct is further "unlawful" because it violates the Federal Food, Drug and Cosmetic Act ("FFDCA"), specifically, (a) 21 U.S.C. § 343(a), which deems food misbranded when the label contains a statement that is "false or misleading in any particular," and (b) 21 C.F.R. § 101.13(i)(3), which bars nutrient content claims voluntarily placed on the front of a product label that are "false or misleading in any respect."

152. Smucker further violates the FFDCA's implanting regulation 21 C.F.R. § 1.21 because it fails to reveal material facts, namely the dangers of PHVO described in detail herein, "in light of other representations," namely the specific statements described herein as misleading.

CLASS ACTION COMPLAINT

153.   Smucker's conduct further violates The California Sherman Food, Drug, and Cosmetic Law ("Sherman Law"), Cal. Health & Safety Code § 110660, which deems food products "misbranded" if their labeling is "false or misleading in any particular," and Health & Safety Code § 110670, which bars nutrient content claims voluntarily placed on the front of a product label that fail to comply with the federal regulation for nutrient content claims (i.e., "may not be false or misleading in any respect").

154.   All of the challenged labeling statements made by Smucker thus constitute violations of the FFDCA and the Sherman Law and as such violated the "unlawful" prong of the UCL.

155.   Smucker leveraged its deception to induce Plaintiff and members of the California Class to purchase products that were of lesser value and quality than advertised.

156.   Plaintiff suffered injury in fact and lost money or property as a result of Smucker's deceptive advertising: she was denied the benefit of the bargain when she decided to purchase the Smucker PHVO Products over competitor products, which are less expensive and/or contain no artificial trans fat.

157.   Had Plaintiff been aware of Smucker's false and misleading advertising tactics, she would not have purchased the Smucker PHVO Products, and/or paid less for them.

158.   In accordance with Bus. & Prof Code § 17203, Plaintiff seeks an order enjoining Smucker from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices and to commence a corrective advertising campaign.

159.   Plaintiff also seeks an order for the disgorgement and restitution of all monies from the sale of the Smucker PHVO Products, which were acquired through acts of unlawful, unfair, and/or fraudulent competition.

CLASS ACTION COMPLAINT

# FIFTH CAUSE OF ACTION

## California Unfair Competition Law, Unfair and Fraudulent Prongs

## Bus. & Prof. Code §§ 17200 *et seq.*,

## (On behalf of the California Class)

160.   Plaintiff Caldera realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

161.   Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

162.   Smucker leveraged its deception to induce Plaintiff and members of the Class to purchase products that were of lesser value and quality than advertised.

163.   Plaintiff suffered injury in fact and lost money or property as a result of Smucker's deceptive advertising: she was denied the benefit of the bargain when she decided to purchase the Smucker PHVO Products over competitor products, which are less expensive and/or contain no artificial trans fat.

164.   Had Plaintiff been aware of Smucker's false and misleading advertising tactics, she would not have purchased the Smucker PHVO Products and/or paid less for them.

165.   The acts, omissions, misrepresentations, practices, and non-disclosures of Smucker as alleged herein constitute "unfair" business acts and practices because Smucker's conduct is immoral, unscrupulous, and offends public policy; and because the gravity of Smucker's conduct outweighs any conceivable benefit of such conduct.

166.   The acts, omissions, misrepresentations, practices, and non-disclosures of Smucker as alleged herein constitute "fraudulent" business acts and practices in that Smucker's conduct has a tendency to deceive Plaintiff, the Classes, and the general public.

167.   In accordance with Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining Smucker from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices and to commence a corrective advertising campaign.

CLASS ACTION COMPLAINT

168.   Plaintiff further seeks an order for the disgorgement and restitution of all monies from the sale of the Smucker PHVO Products which were acquired through acts of unlawful, unfair, and/or fraudulent competition.

## SIXTH CAUSE OF ACTION

**California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq*.**

**(On behalf of the California Class)**

169.   Plaintiff Caldera realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

170.   In violation of Bus. & Prof. Code §§ 17500 *et seq*., the advertisements, labeling, policies, acts, and practices described herein were designed to, and did, result in the purchase and use of the Smucker PHVO Products without the knowledge that they contained toxic artificial *trans* fat.

171.   Smucker knew and/or reasonably should have known that the labels on the Smucker PHVO Products were untrue and/or misleading.

172.   As a result, Plaintiff, the Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Smucker was unjustly enriched.

## SEVENTH CAUSE OF ACTION

**California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq*.**

**(On behalf the California Class)**

173.   Plaintiff Caldera realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

174.   The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

175.   Smucker's policies, acts and practices were designed to, and did, result in the purchase and use of the products primarily for personal, family, or household purposes, and violated and continue to violate the following sections of the CLRA:

1        a.    § 1770(a)(5): representing that goods have characteristics, uses, or

2  benefits which they do not have.

3        b.    § 1770(a)(7): representing that goods are of a particular standard,

4  quality, or grade if they are of another.

5        c.    § 1770(a)(9): advertising goods with intent not to sell them as

6  advertised.

7        d.    § 1770(a)(16): representing the subject of a transaction has been

8  supplied in accordance with a previous representation when it has not.

9     176.   As a result, Plaintiffs and the Classes have suffered irreparable harm and are

10  entitled to injunctive relief.

11     177.   In compliance with Civ. Code § 1782, Plaintiff Lucina Caldera sent Smucker

12  written notice of her claims on May 25, 2012, which was received on May 29, 2012.

13     178.   If Smucker does not change its practices in response to the letter, Plaintiffs

14  intend to amend the Complaint on or after June 29, 2012 to include actual and punitive

15  damages under the CLRA, which are not yet prayed for herein.

16                      **EIGHTH CAUSE OF ACTION**

17          **Breach of Express Warranty Under Ohio Law**

18             **(On behalf of the Nationwide Class)**

19     179.   Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint

20  as if set forth in full herein.

21     180.   During the class period, Defendant made written representations to the

22  public, including Plaintiffs, that Crisco is "All-Vegetable." This promise and related

23  promises printed on the label became the basis of the bargain between the parties and

24  thus constituted an express warranty.

25     181.   Thereon, Defendant sold the goods to Plaintiffs and other consumers who

26  bought the goods from Defendant.

27     182.   However, Defendant breached this express warranty in that Crisco is not

28  "All-Vegetable," because vegetables are naturally-occurring substances but Crisco

1  contains PHVO, an artificial substance manufactured using vegetables but containing
2  high amounts of the harmful form of *trans* fat, which is found nowhere in nature, much
3  less in vegetables or something that purports to be "All" (equivalent to "100%")
4  vegetable.

5      183.  During the class period, Defendant made written representations to the
6  public, including Plaintiffs, that Uncrustables Sandwiches are "Wholesome." This
7  promise and related promises printed on the label became the basis of the bargain
8  between the parties and thus constituted an express warranty.

9      184.  Thereon, Defendant sold the goods to Plaintiffs and other consumers who
10 bought the goods from Defendant.

11     185.  However, Defendant breached this express warranty in that Uncrustables
12 Sandwiches are not "Wholesome" because they contain PHVO, a substance high in *trans*
13 fat, which is strongly linked to a plethora of human ailments, and because they contain
14 large amounts of HFCS.

15     186.  As a result of this breach, Plaintiffs and other consumers in fact did not
16 receive goods as warranted by Defendant.

17     187.  As a proximate result of this breach of warranty by Defendants, Plaintiffs
18 and other consumers have been damaged in an amount to be determined at trial.

19                          **NINTH CAUSE OF ACTION**
20        **Breach of Implied Warranty of Merchantability Under Ohio Law**
21                     **(On behalf of the Nationwide Class)**

22     188.  Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint
23 as if set forth in full herein.

24     189.  During the class period, Defendant made written representations to the
25 public, including Plaintiffs, that Crisco is "All-Vegetable."

26     190.  However, Defendant breached this warranty implied in the contract for sale
27 of goods in that Crisco Original Shortening and Crisco Butter Shortening are not "All-
28 Vegetable" because they contain PHVO, an artificial substance manufactured using

vegetables but containing high amounts of the harmful form of *trans* fat that is not found in vegetables.

191. During the class period, Defendant made written representations to the public, including Plaintiffs, that Uncrustables Sandwiches are "Wholesome."

192. However, Defendant breached this express warranty in that Uncrustables Sandwiches are not "Wholesome" because they contain PHVO, a substance high in *trans* fat, which is strongly linked to a plethora of human ailments, and because they contain large amounts of HFCS.

193. During the class period, Defendant made written representations to the public, including Plaintiffs, that Crisco is appropriate for use as a healthful alternative to butter as concerns fat content. The combination of the statement that the products contain less saturated fat, a diagram comparing the saturated fat contents, and a statement in bold recommending that consumers "USE INSTEAD OF BUTTER OR MARGARINE," warrants that these products are to be used as a healthful alternative to butter as concerns fat content.

194. However, Defendant breached this warranty implied in the contract for sale of goods in that Crisco Original Shortening and Crisco Butter Shortening are not more healthful alternatives to butter as concerns fat content because they contain high levels of *trans* fats, a fact which far outweighs the reduction in saturated fat as concerns human ailments.

195. Defendant was a merchant with respect to goods of this kind which were sold to Plaintiffs and other consumers, and there was in the sale to Plaintiffs and other consumers an implied warranty that those goods were merchantable.

196. As a result of Defendant's conduct, Plaintiffs and other consumers did not receive goods as impliedly warranted by Defendant to be merchantable.

197. As a proximate result of this breach of warranty by Defendants, Plaintiffs and other consumers have been damaged in an amount to be determined at trial.

## **TENTH CAUSE OF ACTION**

### **Breach of Express Warranty Under California Law**

### **(On behalf of the California Class)**

198.   Plaintiff Caldera realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

199.   During the class period, Defendant made written representations to the public, including Plaintiff Caldera, that Crisco is "All-Vegetable." This promise and related promises printed on the label became the basis of the bargain between the parties and thus constituted an express warranty.

200.   Thereon, Defendant sold the goods to Plaintiff Caldera and other consumers who bought the goods from Defendant.

201.   However, Defendant breached this express warranty in that Crisco is not "All-Vegetable" because it contains PHVO, an artificial substance manufactured using vegetables but containing high amounts of the harmful form of *trans* fat that is not found in vegetables.

202.   During the class period, Defendant made written representations to the public, including Plaintiff Caldera, that Uncrustables Sandwiches are "Wholesome." This promise and related promises printed on the label became the basis of the bargain between the parties and thus constituted an express warranty.

203.   Thereon, Defendant sold the goods to Plaintiff Caldera and other consumers who bought the goods from Defendant.

204.   However, Defendant breached this express warranty in that Uncrustables Sandwiches are not "Wholesome" because they contain PHVO, a substance high in *trans* fat, which is strongly linked to a plethora of human ailments, and because they contain large amounts of HFCS.

205.   As a result of this breach, Plaintiff Caldera and other consumers in fact did not receive goods as warranted by Defendant.

CLASS ACTION COMPLAINT

206.   As a proximate result of this breach of warranty by Defendants, Plaintiff Caldera and other consumers have been damaged in an amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION

### Breach of Implied Warranty of Merchantability Under California Law

### (On behalf of the California Class)

207.   Plaintiff Caldera realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

208.   During the class period, Defendant made written representations to the public, including Plaintiff Caldera, that Crisco Original Shortening and Crisco Butter Shortening are "All-Vegetable."

209.   However, Defendant breached this warranty implied in the contract for sale of goods in that Crisco Original Shortening and Crisco Butter Shortening are not "All-Vegetable" because they contain PHVO, an artificial substance manufactured using vegetables but containing high amounts of the harmful form of *trans* fat that is not found in vegetables.

210.   During the class period, Defendant made written representations to the public, including Plaintiff Caldera, that Uncrustables Sandwiches are "Wholesome."

211.   However, Defendant breached this express warranty in that Uncrustables Sandwiches are not "Wholesome" because they contain PHVO, a substance high in *trans* fat, which is strongly linked to a plethora of human ailments, and because they contain large amounts of HFCS.

212.   During the class period, Defendant made written representations to the public, including Plaintiff Caldera, that Crisco is appropriate to use as a healthful alternative to butter as concerns fat content. The combination of the statement that the products contain less saturated fat, a diagram comparing the saturated fat contents, and a statement in bold recommending that consumers "USE INSTEAD OF BUTTER OR MARGARINE" warrants that these products are to be used as a healthful alternative to butter as concerns fat content.

CLASS ACTION COMPLAINT

213.   However, Defendant breached this warranty implied in the contract for sale of goods in that Crisco Original Shortening and Crisco Butter Shortening are not more healthful alternatives to butter as concerns fat content because they contain high levels of *trans* fats, a fact which far outweighs the reduction in saturated fat as concerns human ailments.

214.   Defendant was a merchant with respect to goods of this kind which were sold to Plaintiff and other consumers, and there was in the sale to Plaintiff Caldera and other consumers an implied warranty that those goods were merchantable.

215.   As a result of Defendant's conduct, Plaintiff Caldera and other consumers did not receive goods as impliedly warranted by Defendant to be merchantable.

216.   As a proximate result of this breach of warranty by Defendants, Plaintiff Caldera and other consumers have been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, all others similarly situated, and the general public, prays for judgment against Defendants as follows:

A.   An order confirming that this class action is properly maintainable as a class action as defined above and appointing Plaintiffs and their undersigned counsel to represent the class;

B.   An order confirming that this class action is properly maintainable as a California class action as defined above and appointing Plaintiff Caldera and her undersigned counsel to represent the class;

C.   An award for compensatory damages for Plaintiffs and members of the Classes in excess of $25,000 and all monetary relief authorized by law or referenced in the Complaint;

D.   Where authorized by law and referenced in this Complaint, an order requiring Smucker to pay damages to Plaintiffs and class members so that they may be restored any money which may have been acquired by means of any unfair, deceptive, unconscionable, fraudulent or negligent action;

1    E.    An order requiring Smucker to disgorge any benefits received from
2          Plaintiffs and/or unjust enrichment realized as a result of its improper and
3          misleading advertising and marketing of the Smucker PHVO Products;

4    F.    An award of punitive damages to the extent allowable by law and referenced
5          in the Complaint, in an amount to be proven at trial;

6    G.    An order requiring Smucker to cease and desist its deceptive,
7          unconscionable and fraudulent practices;

8    H.    An order requiring Smucker to engage in an corrective advertising
9          campaign;

10    I.    An award of prejudgment and post judgment interest;

11    J.    An award of attorney's fees and costs; and

12    K.    Such other and further relief as this Court may deem just, equitable or
13          proper.

14    217.    Notwithstanding this prayer, Plaintiffs until the time for amendment of their
15 CLRA claim to include claims for damages, disclaim in this complaint only claims for
16 damages under the CLRA.

17                    **JURY DEMAND**

18    Plaintiffs demand a trial by jury on their claims for damages.

19

20 DATED: June 5, 2012          Respectfully Submitted,

21

22                    **THE WESTON FIRM**
23                    GREGORY S. WESTON
24                    JACK FITZGERALD
                      MELANIE PERSINGER
25                    COURTLAND CREEKMORE
26                    1405 Morena Blvd., Suite 201
                      San Diego, CA 92110
27                    Telephone: (619) 798-2006
                      Facsimile: (480) 247-4553
28

CLASS ACTION COMPLAINT

**THE LAW OFFICES OF**
**RONALD A. MARRON, APLC**
RONALD A. MARRON
MAGGIE K. REALIN
SKYE RESENDES
3636 4th Avenue, Suite 202
San Diego, CA 92109
Telephone: (619) 696-9006
Facsimile: (619) 564-6665

**<u>Counsel for Plaintiffs</u>**

CLASS ACTION COMPLAINT